## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHANDRAKANT R. PATEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:12-cv-00969 |
| | ) | |
| ERIC K., SHINSEKI, *Secretary, Department* | ) | |
| *of Veterans Affairs,* | ) | Judge Mark R. Hornak |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff Chandrakant R. Patel ("Dr. Patel"), a retired part-time physician at the VA Pittsburgh Healthcare System, brings suit against Defendant Eric K. Shinseki in his official capacity as Secretary for the Department of Veterans Affairs, alleging age discrimination after Dr. Patel was allegedly terminated from his employment in retaliation for voicing complaints of discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"). Before the Court is Defendant Secretary Shinseki's Motion for Summary Judgment, ECF No. 21. The parties have extensively briefed this Motion and the Court's deliberations have been materially aided by the oral argument presented by counsel. For the reasons that follow, Defendant's Motion is granted.

## I.    BACKGROUND

While the parties contest many matters related to Dr. Patel's employment, the relevant material facts are straightforward and undisputed.

### a. Dr. Patel's employment history at VA Pittsburgh Healthcare Systems.

In August of 2003, Plaintiff Dr. Patel was appointed to the position of part-time physician with VA Pittsburgh Healthcare Systems ("VAPHS"). Def.'s Stat. of Material Facts in Supp. of Summ. J. ¶ 9, ECF No. 23 (hereinafter "Def.'s Stat. Facts"). The VA Handbook sets forth the VA's policy regarding the employment of part-time physicians as follows:

> It is VHA [Veterans Health Administration] policy to use the services of qualified individuals on a part-time or intermittent basis when necessary to alleviate recruitment difficulties and in all cases where VHA work requirements do not support employment on a full-time basis. Decisions concerning utilization of part-time or intermittent employees must be related to patient care and other VA work requirements and supported by relevant staffing guidelines.

Def.'s Stat. Facts ¶ 12. Dr. Patel alleged that upon his hire he received a "verbal" promise from Dr. Mona Melhem, Associate Chief of Staff and Vice President of the Clinical Support Service Line, that he would be converted to full-time status in the future. *Id.* at ¶ 13. The Chief of Staff for VAPHS, Dr. Sonel, testified that there is no authority within the VA to make guarantees for future employment. *Id.* at ¶ 14.

Upon starting his VA employment in 2003, Dr. Patel worked in the nuclear medicine ("NM") section where he and a fellow physician, Dr. Klein, split a full-time position by each working a part-time "0.5" appointment. *Id.* at ¶ 17.[1] Plaintiff frequently inquired about full-time employment and was informed that the nuclear medicine section's workload only justified a part-time physician position. *Id.* at ¶ 20. However, Dr. Patel was provided with additional work opportunities to help alleviate his self-stated financial constraints. *Id.*

---

[1] Dr. Patel describes nuclear medicine as follows: "[i]n nuclear medicine, the patient is given radioactive isotopes intravenously and then images are done of specific body parts." Chandrakant Patel Dep. 14:11-13, Jan. 24, 2013, ECF No. 28-2.

### b.     Positron Emission Tomography scanning at the VA.

Positron Emission Tomography ("PET") scanning, a relatively new technology, was not applied in hospitals' clinical setting until after the year 2000. *Id.* at ¶ 23. PET scanning has been formally described as follows:

> A positron emission tomography scan is a safe, effective and painless molecular imaging exam that is used to detect the presence and extent of cancer, cardiovascular disease, neurological conditions and other physiological problems. While other imaging techniques – such as X-rays or CT scans – provide anatomical information about the way organs or tissues *look*, a PET scan shows what the cells in those organs or tissues are *doing*. That functional information is then used for diagnosis, evaluation and treatment of disease.

*Id.* at ¶ 24. The training required to administer and read PET scans is significant and involves coursework and performing hundreds of case studies under the supervision of a qualified individual. *Id.* at ¶ 26. Dr. Patel had no post-doctorate training or fellowship in PET scanning, and his pre-VA Pittsburgh employment did not include the administration of PET scans and interpretation of PET scan imagery. *Id.* at ¶¶ 27, 28. VAPHS physicians must obtain PET credentialing and clinical privileges from the VA's credentialing committee in order to perform and interpret PET scan imagery for VAPHS. *Id.* at ¶ 29. Dr. Patel was never credentialed by the VA in PET scan imagery, and was therefore categorically unqualified to perform PET scans at VAPHS. *Id.* at ¶ 30.

In 2007, the VA published a directive (hereinafter "the PET Directive") authorizing the acquisition and increased use of PET scanning as a vital resource within the VA medical community. *Id.* at ¶ 31. Previously, the VA had a contract with the University of Pittsburgh to perform its PET/CT services. *Id.* at ¶ 32. In 2008, VAPHS acquired a PET scan machine in the nuclear medicine section; however, neither Dr. Patel nor Dr. Klein were qualified to use the PET scan machine. *Id.* at ¶ 33. The PET Directive tasked each facility director with the responsibility

3

of ensuring that professional medical staff providing PET interpretations were credentialed and privileged. *Id.* at ¶ 34.

On January 9, 2008, the VA hired Dr. Tanuja Kanderi as a part-time physician and assigned her to the nuclear medicine section with the primary responsibility of administering and interpreting PET/CT scans at VAPHS. *Id.* at ¶ 35. At the time of her hire, Dr. Kanderi was under 40 years of age. *Id.* at ¶ 36. Dr. Kanderi's credentials included a board certification in nuclear medicine and completion of a PET/CT fellowship at Stanford University. *Id.* at ¶ 37. She was also credentialed and received clinical privileges from the VA credentialing committee to perform PET scans. *Id.* at ¶ 38. Dr. Kanderi initially worked a part-time schedule of three days per week. *Id.* at ¶ 39.

### c. The PET workload increase and the conversion of Dr. Kanderi to full-time employment.

VA Statistics Reports reveal that the PET scan workload of VAPHS steadily increased between the years 2008-2011 as follows: 2008 (228 cases); 2009 (610 cases); 2010 (809 cases); and 2011 (929 cases). *Id.* at ¶ 40. According to Chief of Staff Dr. Jain, VAPHS's PET scan workload was brought back in-house. *Id.* at ¶ 41. Dr. Jain also testified that oncologists and other clinicians requested PET/CT scan availability at VAPHS five days per week as opposed to the three days per week that were being performed by Dr. Kanderi. *Id.* at ¶ 42. According to Dr. Jain, it was most cost-effective to convert Dr. Kanderi to full-time status in order to meet the needs of the increased workload in PET/CT scans at VAPHS. *Id.* at ¶ 43. Dr. Kanderi was officially converted to full-time status effective February 14, 2010. *Id.* at ¶ 44. In addition to performing PET scans, Dr. Kanderi assisted with non-PET nuclear medicine cases. *Id.* at ¶ 57.

### d. Dr. Klein's retirement and Dr. Patel's request for full-time work.

In a June 2, 2010 email sent to various VAPHS officials, Dr. Patel indicated that he was notified of Dr. Klein's imminent retirement and requested conversion to a full-time physician position in the Nuclear Medicine Department. *Id.* at ¶ 50. Dr. Klein retired from his part-time nuclear medicine position effective June 30, 2010. *Id.* at ¶ 51. In a Memorandum dated July 1, 2010, and addressed to Director Terry Wolf (the CEO of VAPHS and supervisor of over 3,100 employees), Dr. Patel again requested conversion to a full-time position in the Nuclear Medicine Department. *Id.* at ¶¶ 52, 60. Director Wolf responded to Dr. Patel's request and indicated that Dr. Patel needed to route his request through both the Chief of Staff, Dr. Sonel, "with a complete workload analysis and justification," and through the Associate Director in charge of position management. *Id.* at ¶ 53. Dr. Sonel told Dr. Patel to "keep in mind that all staffing plans must be driven by the needs of our Veterans and not by the need or desires of our providers." *Id.* at ¶ 54.

### e. The GlidePath fiscal plan and Dr. Patel's termination.

In a June 22, 2011 Memorandum, Director Wolf notified all Vice Presidents/Service Chiefs of the "GlidePath" fiscal plan and requested that they review their organizational charts to determine where cuts and manpower reductions could be made. *Id.* at ¶ 60. GlidePath was a national initiative for the entire Veterans Health Administration to examine the VA's allocation of resources to identify operations that were not as efficient as others. *Id.* at ¶ 61. Upon receipt of Director Wolf's GlidePath Memorandum, Chief of Staff Dr. Sonel sent an email to all departments and service lines asking them to evaluate such matters as physician workforce; opportunities for increasing efficiencies in the clinical work being performed by the VA's legacy programs; the productivity of each physician; and to provide a list of part-time physician providers who might no longer be needed. *Id.* at ¶ 63. Dr. Sonel directed his managers to

consider the following factors: (1) the ability of existing full-time providers to absorb the workload of part-time providers; (2) the breadth of the skill set offered by part-time providers; and (3) the ability of part-time providers to be able to cross over other providers within the relevant specialty. *Id.* at ¶ 64.

In an email dated June 28, 2011, Dr. Akwayena, the Acting Chief of Imaging Services, responded to Dr. Sonel's request for a GlidePath analysis and ranked Dr. Patel as the first physician to be eliminated should a workforce reduction be necessary. *Id.* at ¶ 66. Dr. Akwayena concluded that (1) Dr. Patel's workload could be absorbed by other full-time physicians; (2) Dr. Patel's skill set did not include the interpretation of PET/CT scans; and (3) cross-coverage of nuclear medicine duties could be performed by qualified radiologists. *Id.* at ¶ 67. Dr. Sonel concurred in Dr. Akwayena's recommendation. *Id.* at ¶ 69. Dr. Patel was officially notified and given a letter of termination on December 2, 2011. *Id.* at ¶ 74. In addition to Dr. Patel, several other part-time VA physicians had their appointments terminated as a result of the GlidePath reduction. *Id.* at ¶ 76; *see* Ex. 36 (Def.'s Resp. to Interrog. No. 1).

### f.   Dr. Patel's age discrimination claims.

On March 28, 2012, Dr. Patel sought EEO counseling where he alleged discrimination based on age, and on April 1, 2012, he was notified that he could either file an EEO Complaint or pursue a direct action in federal court. *Id.* at ¶ 79.[2] Dr. Patel contends that he made verbal complaints to VAPHS about age discrimination on the following occasions: (1) August 2010 to Dr. Shah; (2) September 2010 to Dr. Shah; (3) October 2010 to Dr. Sonel; (4) November 2010 to Dr. Sonel; (5) January 2011 to Dr. Akwayena; and (6) March 2011 to Dr. Sonel. *Id.* at ¶ 85. Dr. Patel identified Dr. Sonel and Director Wolf as the two persons who retaliated against him for this "opposition conduct" because they were the administrative authorities responsible for the

---

[2] Plaintiff does not allege that these particular actions constituted his "opposition conduct" protected by the ADEA.

termination decision. *Id.* at ¶ 84. Dr. Patel made no allegation that he made verbal complaints of age discrimination to Director Wolf. *Id.* at ¶ 86. On July 11, 2012, Dr. Patel filed suit in this Court, alleging two counts under the ADEA: Count I: "Violation of ADEA - Retaliation," and Count II: "Violation of ADEA - Termination of Employment."

## II. DISCUSSION

### a. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp,* 475 U.S. 574, 587 (1986); *Huston v. Procter & Gamble Paper Products Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. *See Anderson,* 477 U.S. at 247–48.

In reviewing the evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587–88; *Huston,* 568 F.3d at 104 (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to

7

make credibility determinations. *See Anderson,* 477 U.S. at 255; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny,* 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.,* 477 U.S. at 323-24).

**b.     Retaliation under the Age Discrimination in Employment Act**[3]

"The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, term, conditions, or privileges of employment on the basis of their age." *Duffy v. Paper Magic Grp., Inc.,* 265 F.3d 163, 167 (3d Cir. 2001) (citing 29 U.S.C. § 623(a)(1)). The ADEA also prohibits retaliation based on age by making it "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has *opposed any practice made unlawful by this section,* or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or litigation under this chapter." 29 U.S.C. § 623(d) (emphasis added). The ADEA protects "individuals who are at least 40 years of age," 29 U.S.C. § 631(a), and its prohibitions are limited to employers with over 20 employees, 29 U.S.C. § 630(b). Dr. Patel was 62 years old at the time of his termination, so he clearly falls within the class of persons entitled to statutory protection from age discrimination. It is undisputed that VAPHS employs more than 20 employees, so

---

[3] At oral argument on Defendant's Motion for Summary Judgment on August 19, 2013, Plaintiff conceded that he was dropping Count II of his Complaint, "Violation of ADEA - Termination of Employment." Thus, only Count I remains. This does not affect the merits of Plaintiff's ADEA retaliation claim, as the anti-retaliation provision of the statute exists separate and apart from the anti-discrimination provision. *See Burlington N. & Santa Fe Ry. Co. v. White,* 126 S. Ct. 2405, 2412 (2006) ("The substantive [anti-discrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct.").

VAPHS falls within the scope of the ADEA, as well. *See* Chandrakant Patel Dep. 9:19-20, Jan. 24, 2013, ECF No. 28-2.

"Age discrimination may be established by direct or indirect evidence." *Duffy*, 265 F.3d at 167. Because there is no "direct evidence" of age discrimination in this case, the United States Supreme Court's analytical framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973), applies. See *Barber v. CSX Distribution Services*, 68 F.3d 694, 701 (3d Cir. 1995) ("[t]he procedural framework in ADEA retaliation cases also follows that of Title VII disparate treatment cases as set forth in *McDonnell Douglas*"). Therefore, Plaintiff must establish a *prima facie* case of retaliation under the ADEA by showing "(1) that he engaged in protected conduct; (2) that he was subject to an adverse employment action subsequent to such activity; and (3) that a causal link exists between the protected activity and the adverse action." *Barber*, 68 F.3d at 701 (internal citation omitted); *Krouse v. American Sterilizer Company*, 126 F.3d 494, 500 (3d Cir. 1997) (describing the third requirement as a "causal connection").

With regard to the second requirement of a *prima facie* case of retaliation, it is undisputed that Dr. Patel was officially notified and given a letter of termination on December 2, 2011, after he engaged in activity alleged to have been opposition conduct protected under the ADEA. Def.'s Stat. Facts ¶ 74. Plaintiff's termination therefore fulfills the second requirement of a *prima facie* case of retaliation, leaving the first and third requirements for this Court's analysis.

### 1. Dr. Patel did not engage in opposition conduct protected by the ADEA.

A plaintiff must first establish for a *prima facie* case of retaliation that s/he engaged in protected conduct. *See Barber*, 68 F.3d at 701. An ADEA retaliation claimant engages in "protected conduct" when s/he "opposes any practice made unlawful by [the Act]." *See* 29 U.S.C. § 623(d). The Third Circuit "do[es] not require a formal letter of complaint to an

employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct' under the ADEA." *Barber*, 68 F.3d at 702; *see, e.g.*, *Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (explaining that acceptable forms of protected activity under Title VII's analogous opposition clause include formal charges of discrimination "as well as informal protests of discriminatory employment practices, including making complaints to management . . . protesting against discrimination by industry or society in general, and expressing support of co-workers who have filed formal charges). Indeed, this Court's analysis must focus on "the message that [Dr. Patel] conveyed, and not the medium of conveyance." *See Barber*, 68 F.3d at 702.

Dr. Patel conceded that he does not challenge as being age discrimination VAPHS's decision to convert Dr. Kanderi to work full-time in February of 2010. *See* Def.'s Ex. 12 (Dr. Patel's response to Interrogatory No. 1 where he "expressed that he believed he had been discriminated against due to age *beginning in June 2010*") (emphasis added).[4] Given this reality, the Court's examination of Dr. Patel's complaints to VAPHS reveals that they did not constitute "opposition conduct" to "any practice made unlawful by the Act." Dr. Patel avers that he made verbal complaints about age discrimination on the following occasions: (1) August 2010 to Dr. Shah; (2) September 2010 to Dr. Shah; (3) October 2010 to Dr. Sonel; (4) November 2010 to Dr. Sonel; (5) January 2011 to Dr. Akwayena; and finally (6) March 2011 to Dr. Sonel. Def.'s Stat. Facts ¶ 85. Dr. Patel testified that the gravamen of his verbal complaints was that Dr. Kanderi "was being promoted" over Dr. Patel because she was 25 to 30 years younger and less experienced. *See, e.g.*, Patel Dep. 71:19-73:21. For example, when asked at his deposition whether he specifically told Dr. Shah that he was being discriminated against because of his age,

---

[4] June 2010 coincides with Dr. Klein's retirement and Dr. Patel's intense lobbying to be converted to full-time status.

Dr. Patel replied "[y]es. I told him that Kanderi was 25 to 30 years younger than me and less experienced, but she was converted to full time ahead of me, even though I was told in 2003 that I would be converted to full time when Dr. Klein retired."[5] *Id.* at 73:18-21. Dr. Patel further testified:

> Q: But in all of these responses it says that you were concerned because she was less experienced and much younger than you, by you didn't specifically say that you were concerned that you were being discriminated against based upon your age; is that right?
> A: But I mentioned them. She is much younger than me.
> Q: Right. But you didn't specifically tell Sonel or Dr. Shah that you believe that this is an example of age discrimination, did you?
> A: I assumed they would understand.
>                                    *    *    *
> Q: You didn't use those words that you were being discriminated against based upon age?
> A: No, I didn't use those words. I assumed they would understand that Dr. Kanderi is 25 to 30 years younger than Dr. Patel and that is why Dr. Patel is complaining.

*Id.* at 73:22-74:16. Given Dr. Patel's response to Interrogatory No. 1 that he believed any age discrimination only began in June 2010 (months after Dr. Kanderi's full-time NM/PET assignment), these statements cannot be considered complaints in opposition to unlawful age discrimination in Dr. Kanderi's assignment, notwithstanding Dr. Patel's efforts to use "magic words." Instead, Dr. Patel's account of his verbal complaints can only be read as protesting that he should have received a full-time job he believed he had been promised *because* he was older, and that it was unfair that VAPHS did not provide him with such preferential treatment because of his age in awarding the full-time position (that he was definitionally unqualified to fill because of his lack of the requisite PET credentialing).

Dr. Patel's other interrogatory responses similarly illuminate the nature of his complaints to VAPHS and similarly ignore the reality that when Dr. Klein retired, Dr. Kanderi had already

---

[5] Dr. Patel apparently made no mention of the uncontradicted fact that Dr. Kanderi was PET-qualified for a PET-based position, and he was not.

been in place for four months, doing the PET analysis that Dr. Patel was unqualified to execute. When asked to list and describe every "complaint to the Defendant that you had been discriminated against due to . . . age by the promotion of Dr. Kanderi over you," Dr. Patel responded:

In or about early August, 2010, Plaintiff met with Dr. Shah. During that meeting, he discussed with Dr. Shah his concern that Dr. Kanderi had been promoted to full-time, and that *this had occurred despite Dr. Melhem having promised him that he would be promoted to full-time when Dr. Klein retired.* Further, he complained to Dr. Shah that *Dr. Kanderi was being promoted despite her being 25-30 years younger than him and less experienced.*

In or about September, 2010, Plaintiff again met with Dr. Shah to discuss Dr. Kanderi not accepting thyroid cancer consultations. During the course of the discussion with Dr. Shah about this issue, Plaintiff again told Dr. Shah that it was *unfair that she had been promoted,* and also that it was unfair that she was not following instructions regarding patient care with respect to thyroid patients, and that *she was less experienced and 25-30 years younger than both Dr. Shah and him.*

In or about October, 2010, Plaintiff met with Dr. Sonel to discuss his outstanding request that he be converted to full-time employment. He told Dr. Sonel that it *was wrong that Dr. Kanderi had been converted to full-time employment despite being less experienced and 25-30 years younger than him.* He also discussed issues regarding thyroid therapy consult issues and Dr. Kanderi's reluctance to accept such consults with Dr. Sonel.

In or about November, 2010, Plaintiff met with Dr. Sonel to discuss issues regarding Plaintiff's schedule. During that meeting, Plaintiff again raised the issue of his request to be employed full-time as well as his *objection to Dr. Kanderi having been promoted, despite her lack of experience and her being younger than him.*

In or about January, 2011, Plaintiff met with Dr. Akwayena, regarding his request to be converted to full time. He told Dr. Akwayena that he believed *it was unfair that Dr. Kanderi had been converted to full time employment despite her lack of experience and her being younger than him.*

In or about March 2011, Plaintiff had another conversation with Dr. Sonel regarding his outstanding request for conversion, and he again expressed his *belief that he had been treated unfairly in comparison to Dr. Kanderi, with regard to her being converted to full time employment despite her lack of experience and her being younger than him.*

Pl.'s Ex. J, ECF No. 28-11 (Answers to Def.'s Second Set of Interrogs.) (emphasis added).

While it is not required that Dr. Patel have been correct about the merits of any age discrimination complaint he made to his employer, in order to constitute opposition conduct protected under the ADEA, Dr. Patel's complaints had to be more than "general complaints of unfair treatment." *Webb v. Merck & Co., Inc.*, 450 F. Supp. 2d 582, 600 (E.D. Pa. 2006) (citing *Barber*, 68 F.3d at 701–02). Reading Dr. Patel's representations of his verbal complaints to VAPHS in his deposition testimony and interrogatory responses, Dr. Patel's gripe is, at best, that VAPHS did not make a full-time position for him in June 2010, in contravention of a promise he states VAPHS was obliged to keep.

In *Barber v. CSX Distribution Services*, 68 F.3d 694 (3d Cir. 1995), the plaintiff Barber sued under the ADEA, alleging discriminatory failure to promote and retaliation for the letter of complaint that he wrote to the defendant's Human Resources Department. *Barber*, 68 F.3d at 701. The Third Circuit clarified that "[t]he practice made unlawful by § 623 is 'discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such an individual's age.'" *Id.* at 702 (quoting 29 U.S.C. § 623(a)) (emphasis added). "Thus, the statute provides that a person has engaged in 'protected conduct' when s/he opposes discrimination on the basis of age." *Id.* The Third Circuit agreed with the district court's entry of judgment for the employer on Mr. Barber's retaliation claim, affirming the district court's conclusion that "the letter written by plaintiff to the Department of Human Resources was not a complaint opposing a practice made unlawful by the ADEA." *Id.* at 701.

While on one hand the *Barber* court noted that the plaintiff's letter "d[id] not explicitly or implicitly allege that age was the reason for the alleged unfairness" and here, Dr. Patel repeatedly mentioned in his testimony and interrogatory responses describing his verbal

13

complaints that Dr. Kanderi was 25 to 30 years his junior, the linchpin of the *Barber* court's decision was the reality that the specific practice Barber opposed was not a "practice made unlawful" by the ADEA, but rather, "dissatisfaction with the fact that someone else was awarded the position." *Id.* at 701. Similarly here, this Court's analysis must target the specific practice Dr. Patel opposed and then consider whether that practice was one "made unlawful" by the ADEA – discrimination based on Dr. Patel's age.

As set out in Dr. Patel's deposition testimony and interrogatory responses, his complaints to Drs. Shah, Sonel, and Akwayena were complaints - like those of the plaintiff in *Barber* - that Dr. Patel felt he had been "treated unfairly" by the VAPHS administration and that a "position was awarded to a less qualified individual," Dr. Kanderi. *See Barber*, 68 F.3d at 702.[6] Of course, Dr. Patel dodges the reality that Dr. Kanderi had the qualifications VAPHS needed – PET certification – which he did not have. As Dr. Patel, speaking in the third person, testified,

> [The Chief of Staff] Dr. Jain, out of sympathy, forgot me. She forgot that Dr. Patel was the part-time nuclear medicine physician in nuclear medicine; that he was promised a full-time job in nuclear medicine a long time ago. He forgot about that. He fell for the begging and sympathy that Kanderi was generating by crying in his office, begging to become full-time and Dr. Klein fell for that. Dr. Jain fell for that after Kanderi begged so many times to Jain in his office.

Patel Dep. 86:2-9. A close review of Dr. Patel's account of his verbal complaints to VAPHS reveals that what Dr. Patel was opposing was that he should have gotten a full-time job he believed he had been promised because he was older, and that it was unfair that VAPHS did not "keep its promise" and provide him with such preferential treatment because of his age in awarding a full-time position to Dr. Kanderi. Indeed, nowhere does Dr. Patel assert that Dr. Kanderi was promoted to full-time in February 2010 because of her younger age. To the

---

[6] Dr. Sonel testified that he "never heard any complaints about age bias that I can recall." Def.'s Stat. Facts ¶ 90. He "did see that one e-mail where [Dr. Patel] sort of brought up his age, but I thought in that e-mail the reason he brought up his age was number of years of experience that he had, not as age bring a factor in relation to Dr. Kanderi's appointment, if you will." *Id.* at ¶ 91.

14

contrary, Dr. Patel "expressed that he believed he had been discriminated against due to age beginning in June 2010." *See* Def.'s Ex. 12. This is especially important because an ADEA claim requires that age be the sole, "but for" reason for the employer's actions. *Gross v. FBL Financial Services*, 557 U.S. 167, 176-77 (2009); (quoting 29 U.S.C. § 623(a)(1) and concluding that "[i]t follows, then, that under § 623(a)(1), the plaintiff retains the burden of persuasion to establish that age was the "but-for" cause of the employer's adverse action").

Dr. Patel made no complaints when Dr. Kanderi became full-time in February 2010, and only began his complaints after Dr. Klein retired and no full-time nuclear medicine position materialized for him or anyone else. Thus, his post-Klein-retirement complaints demonstrate that his grievance was that the supposed "promise" of full-time employment never materialized, and that his belief that his longer years of (PET-free) experience entitled him a full-time status. It follows that while a reasonable jury could find that VAPHS did not treat Dr. Patel preferentially because of his age, there is insufficient record evidence from which a reasonable jury could find that Dr. Patel's complaints "opposed any practice made unlawful by [the ADEA]" - discrimination based on age. Dr. Patel's issue was simply that the "deal" that he believed he had was not fulfilled by VAPHS.

That all said, even if Dr. Patel's communications were construed as conduct opposing unlawful age discrimination, his communications still remain outside the protective reach of the ADEA. An ADEA retaliation claimant must have a good-faith basis for his or her complaint. *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) (citing *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir.1996) ("Whether the employee opposes, or participates in a proceeding against, the employer's activity, the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title

VII."); *Kendall v. Donahoe*, 913 F. Supp. 2d 186, 188 (W.D. Pa. 2012) *aff'd sub nom. Kendall v. Postmaster Gen. of U.S.*, 13-1229, 2013 WL 5663872 (3d Cir. Oct. 18, 2013) (concluding that claimant did not engage in protected activity because the claimant's EEO Charge "uniformly shows she believed she was retaliated against for filing a federal workers' compensation claim and not a Rehabilitation Act claim); *see also Slagle v. County of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006) (holding that filing of an EEO Charge of Discrimination by itself was not protected activity under Title VII's anti-retaliation provision where that Charge did not facially allege a violation of Title VII's anti-discrimination provisions).

Dr. Patel did not have a good faith basis for his complaint because he was opposing VAPHS's failure to promote him to a position that he knew no longer existed. This is because at the time of Dr. Klein's retirement, any possibility for a new full-time Nuclear Medicine position had already evaporated in favor of a PET-centered position that Dr. Patel could not, by definition, fill. In anticipation of Dr. Klein's retirement, Dr. Akwayena discussed how the Nuclear Medicine practice might be covered. Pl.'s Ex. D, ECF No. 28-5 (Dr. Akwayena's June 1, 2010 email to, *inter alia*, Drs. Patel, Shah, and Kanderi). "In replacing Dr. Klein who was 50% Full-Time Equivalent, I am proposing that we hire a Diagnostic Radiologist whose expertise is in Nuclear Medicine . . . [who can] give us full flexibility with coverage." *Id.* Dr. Akwayena further "believe[d] we can make a case to hire a 100% FTE to replace Dr. Klein and as well as provide the general radiology coverage that we are unable to get from Dr. Armfield." *Id.*[7]

The record reveals that these musings by Dr. Akwayena went nowhere in terms of the hiring of a full-time one-to-one substitute for Dr. Klein, and VAPHS continued to make Dr. Patel

---

[7] Dr. Akwayena explains that Dr. Armfeldt is a "fee-basis part-time Radiologist but there is a limit to how many days he is able to work each year because the VA has a cap on annual remuneration for fee-basis physicians." Pl.'s Ex. D, ECF No. 28-5.

aware of how Dr. Klein's retirement would affect staffing in the Nuclear Medicine practice. After Dr. Kanderi's promotion but prior to Dr. Klein's retirement, Dr. Shah wrote to Dr. Patel that Dr. Shah's "position about staffing in NM is based on [the] fact that Dr. Klein's void is filled by Dr. Kanderi as we do not have [a] PET-CT scanner being in use full-time. Therefore, I do not see any need for adding another half time or full-time staff in NM." Pl.'s Ex. K at 4-5, ECF No. 28-12 (Dr. Shah's June 22, 2010 email to, *inter alia*, Drs. Patel, Sonel, Akwayena).

Even viewing the facts in a light most favorable to Dr. Patel, once Dr. Klein retired, the full-time nuclear medicine position that Dr. Patel sought, or believed he was promised seven years prior, no longer existed at VAPHS for Dr. Patel or anyone else. It is also undisputed that Dr. Patel was never credentialed by the VA in PET scan imagery and was therefore unqualified for the full-time position to which Dr. Kanderi had been promoted four months prior to Dr. Klein's retirement. *See* Def.'s Stat. Facts ¶ 30; Pl.'s Ex. K at 4-5, ECF No. 28-12. Further, as noted above, Dr. Patel has disclaimed to this Court that he has challenged Dr. Kanderi's February 2010 status change as being unlawfully discriminatory.

In 2008, the VA had hired Dr. Kanderi as a part-time physician and assigned her to the nuclear medicine section with the primary responsibility of administering and interpreting PET-CT scans. Def.'s Stat. Facts ¶ 35. Unlike Dr. Patel, Dr. Kanderi was credentialed and received clinical privileges from the VA credentialing committee to perform PET scans. *Id.* at ¶ 38. Concurrent with the decline in the Nuclear Medicine workload between the years 2009-2012 [6,610 cases (2009); 5,012 cases (2010); 2,642 cases (2011; and 2,421 cases (2012)], was the increase in the PET workload between the years 2008-2011 [2008 (228 cases); 2009 (610 cases); 2010 (809 cases); and 2011 (929 cases)]. *Id.* at ¶¶ 96, 40. As a result, the position Dr. Patel sought and was purportedly orally promised at the time of his hire seven years prior – a full-time

Nuclear Medicine position – was no longer in existence at VAPHS when Dr. Klein retired. Dr. Kanderi, already full-time, was able to absorb both the nuclear medicine workload remaining after Dr. Klein's retirement and the increase in PET practice. *See Kepple v. GPU Inc.*, 2 F. Supp. 2d 730, 741 (W.D. Pa. 1998) ("The employer is entitled to establish the job requirements and the plaintiff must offer more than his own opinion that he is qualified.") (citing *In re Carnegie Center Associates*, 129 F.3d 290, 298 (3d Cir. 1997)).

Thus, Dr. Patel's conclusory assertions regarding his complaints to VAPHS are insufficient to set forth evidence of a genuine issue of material fact from which a reasonable jury could find that Dr. Patel engaged in conduct opposing a practice made unlawful by the ADEA. *See Podobnik*, 409 F.3d at 594 ("To survive summary judgment, a party must present more than just "bare assertions, conclusory allegations or suspicions" to show the existence of a genuine issue."); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) ("Jalil's earlier grievances are insufficient to support a Title VII claim, as they represent nothing more than mere allegations of discrimination.").

### 2. Even if Dr. Patel's oral complaints constituted "protected activity," there is no causal link between Dr. Patel's protected activity and his termination.

Under the third required element of an ADEA plaintiff's *prima facie* case of retaliation, a plaintiff must show that "a causal link exists between the protected activity and the adverse action." *Barber*, 68 F.3d at 701. While Third Circuit jurisprudence "has focused on two main factors in finding the causal link necessary for retaliation: timing and evidence of ongoing antagonism," an ADEA plaintiff "may rely upon a broad array of evidence to illustrate a causal link." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "The element of causation,

which necessarily involves an inquiry into the motives of an employer, is highly content-specific." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997).

Here, Dr. Patel concedes that "the temporal proximity between his protected activity and his loss of employment is not so close that it is sufficiently suggestive of causation standing alone." *See* Pl.'s Br. in Opp'n to Mot. for Summ. J. at 6.[8] Dr. Patel also does not set forth any "evidence of ongoing antagonism"[9] or any ensuing pattern of hostility on the part of VAPHS between the time of Dr. Patel's alleged opposition conduct from August 2010 to March 2011, and his December 2, 2011 termination. *See Abramson*, 260 F.3d at 288. Thus, the Court will look to the record as a whole to determine whether Dr. Patel can establish a causal link between his alleged opposition conduct and his ultimate termination.

It is undisputed that Dr. Patel has specifically identified the CEO of VAPHS, Director Wolf, and the Chief of Staff, Dr. Sonel, as the two VAPHS officials who allegedly retaliated against him. Def.'s Stat. Facts ¶ 84. With regard to Director Wolf's alleged retaliation, the fact that Dr. Patel admitted that he never directly complained to Director Wolf about age discrimination is not fatal to Dr. Patel's retaliation case, as VAPHS could remain liable under the

---

[8] For temporal proximity alone to be sufficient evidence of causation, "the temporal proximity must be 'very close.'" *Clark County School Dist. V. Breeden*, 532 U.S. 268, 273 (2001); *see also Jalil v. Avdel Corporation*, 873 F.2d 701, 708 (3d Cir. 1989) (concluding that period of two days sufficient to defeat summary judgment); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (three-week gap not unusually suggestive); *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (two-month gap is not unusually suggestive); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (finding period of nineteen months insufficient to avoid summary judgment). It is not so close here.

[9] In such a context, courts look to a "pattern of antagonism" in the time period between the alleged opposition conduct and the alleged adverse employment action. *See, e.g., Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir.1993) (almost two years passed between the protected activity and Robinson's discharge. However, the district court found that SEPTA had subjected Robinson to a pattern of harassment during that time period and thus held that this "pattern of antagonism" was sufficient evidence supporting a causal link); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997) (pattern of retaliation included "setting Woodson up to fail" by hiring him as a product system leader in the poorly performing napkin division and then refusing to provide him with adequate resources; Scott's failure to respond appropriately to racist graffiti in its plant; and Scott's termination of Woodson pursuant to a "sham" ranking process performed by individuals who were not familiar with his employment record, but only with his charges of discrimination.).

"cat's paw" theory of liability. *See* Pl.'s Resp. Stat. Facts ¶ 86.[10] The "cat's paw" theory of liability renders an employer liable if those persons exhibiting discriminatory animus influenced or participated in the ultimate decision to terminate, even if those persons were not the formal decision-makers.[11] *See Abramson*, 260 F.3d at 285-86; *McKenna v. City of Philadelphia*, 649 F.3d 171, 177-78 (3d Cir. 2011) *cert. denied*, 132 S. Ct. 1918 (2012) ("A 'cat's paw' or 'subordinate bias' theory of liability is 'one in which [the plaintiff seeks] to hold his employer liable for the animus of a nondecisionmaker.'").

As the Supreme Court explained in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011), when evaluating the "cat's paw" theory with traditional tort-law concepts of proximate cause, "the ultimate decisionmaker's exercise of judgment [does not] automatically render[] the link to the [non-decisionmakers'] bias 'remote' or 'purely contingent.' The decisionmaker's exercise of judgment is also a proximate cause of the employment decision." *Staub*, 131 S. Ct. at 1192 (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004)).

In *Staub*, the plaintiff was fired by the defendant's vice president of human resources after he relied on a subordinate's notice that the plaintiff had violated a prior disciplinary warning. *Staub*, 131 S. Ct. at 1189. That subordinate had allegedly been hostile to the plaintiff's military obligations and was aware that the plaintiff's immediate supervisor was "out to get" the plaintiff prior to issuing that disciplinary warning. *Id.* The plaintiff sued the defendant under the

---

[10] While not specifically discussed at oral argument or in the parties' briefs, the Court finds a discussion of the "cat's paw" theory pertinent to its analysis.

[11] "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. . . . In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011).

Uniformed Services Employment and Reemployment Rights Act of 1994, claiming that his discharge was motivated by hostility to his obligations as a military reservist. *Id.* at 1190.

The plaintiff did not argue that the vice president of human resources had any hostility towards him; rather, the plaintiff argued that his supervisors exhibited discriminatory animus and that their actions influenced the vice president of human resources' ultimate employment decision. *Id.* The Supreme Court held that "if a supervisor performs an act motivated by anti-military animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under the USERRA." *Id.* at 1194. The *Staub* Court found that there was evidence that the plaintiff's supervisors' actions were motivated by hostility towards the plaintiff's military obligations, and there was also evidence that the plaintiff's supervisors' actions were causal factors underlying the vice president of human resources' decision to fire the plaintiff. *Id.* at 1194.

The Third Circuit had previously embraced the "cat's paw" theory in the context of an ADEA claim. In *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265 (3d Cir. 2001), the district court had determined that the ultimate decision-maker in the plaintiff's termination possessed no discriminatory animus towards the plaintiff. *Abramson*, 260 F.3d at 285. However, the Third Circuit concluded that "a rational jury could find that [the ultimate decision-maker] did not make his decision in a vacuum. A reasonable inference that could be drawn from the record is that [the decision-maker] was influenced by [the plaintiff's supervisors who exhibited discriminatory animus." *Id.* at 285-86. Indeed, as the *Abramson* Court recognized, "[u]nder our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate." *Id.* at 286 (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) (stating in ADEA case that if plaintiff's supervisor

participated in decision to terminate him, even though president of company formally terminated him, evidence of supervisor's age-related animus would be relevant in determining if there was discriminatory motive at play)). Here, with regard to Director Wolf, there is no evidence linking her to any act of retaliation based on protected activity. In fact, Director Wolf's sole involvement in Dr. Patel's termination was limited to signing Plaintiff's termination letter after receiving a recommendation from the Chief of Staff, Dr. Sonel. Def.'s Stat. Facts ¶ 87.

Furthermore, unlike *Staub* and *Abramson*, the record here is devoid of any indication that the VA employees to whom Dr. Patel complained about not gaining a full-time nuclear medicine position – Dr. Shah, Dr. Sonel, and Dr. Akwayena – ever exhibited discriminatory animus based on Dr. Patel's age (or his "opposition conduct") that could have motivated any of them to recommend to Director Wolf the termination of Dr. Patel. In *Staub*, one of the plaintiff's supervisors informed a co-worker that the plaintiff's "military duty had been a drain on the department" and wanted help "get[ting] rid of him", and another one of the plaintiff's supervisors referred to the plaintiff's military obligations as "a bunch of smoking and joking and a waste of taxpayers' money." *Staub*, 131 S. Ct. at 1189. In *Abramson*, one of the Orthodox Jewish plaintiff's supervisors had "started to scream that she was tired of hearing about [plaintiff] and her [Jewish] holidays . . . [which] were . . . personal private issues and that she did not want them mentioned at the scheduling meetings", and another one of the plaintiff's supervisors had "screamed at [the plaintiff], saying that if the [plaintiff] would not run a conference for her on Friday night and Saturday night [Sabbath nights], nothing [plaintiff] did would have any value." *Abramson*, 260 F.3d at 269. The Supreme Court in *Staub* and the Third Circuit in *Abramson* both determined that these employees had influenced the ultimate decisionmaker. *See Staub*, 131 S. Ct. at 1194; *Abramson*, 260 F.3d at 285-86.

There is no indication in the record that Drs. Shah, Sonel, and Akwayena ever exhibited any such discriminatory animus. Furthermore, the record is replete with uncontroverted evidence that (1) the VA's GlidePath fiscal plan, which looked in particular at reducing the number of part-time physicians, and (2) Dr. Patel's skill set, which excluded the interpretation of PET/CT exams, were what led to Dr. Patel's termination instead of his promotion. *See* Pl.'s Ex. M, ECF No. 28-14 (Dr. Akwayena's Report); Def.'s Stat. Facts ¶¶ 60, 63 (undisputed facts explaining the Glidepath fiscal plan and its resultant manpower reductions, and Dr. Sonel's concomitant request to provide a list of part-time physician providers who might no longer be needed); *id.* at ¶ 40 (uncontroverted VA Statistics Reports that the PET scan workload increased); *id.* at ¶ 41 (undisputed fact that Dr. Jain testified that the VA PET scan workload was brought back in-house); *id.* at ¶ 29 (undisputed fact that VA physicians must obtain PET credentialing and clinical privileges from the VA's credentialing committee in order to perform and interpret PET scan imagery at the VA); *id.* at ¶ 30 (undisputed fact that Plaintiff testified that he was never credentialed by the VA in PET scan imagery, thus making him unqualified to perform PET scans at the VA).

Dr. Patel argues that "Dr. Shah made his opposition to Plaintiff's promotion and his hostility to Plaintiff clear" via their exchange of emails. Pl.'s Br. in Opp. at 8. Without a doubt, the general workplace tension between Dr. Shah and Dr. Patel was quite palpable (to put it mildly). Dr. Patel wrote that "Dr. Shah told me that he will never allow me to become Full-Time and then said that he will use all his powers to prevent me from becoming Full-Time in Nuclear Medicine." Pl.'s Ex. F, ECF No. 28-7 (Dr. Patel's June 18, 2010 email to Dr. Sonel, Dr. Jain, and Director Wolf). Dr. Patel claimed that "I very well know that Dr. Shah is acting under the guidance of Dr. Chacko who is bent upon taking revenge against everybody who filed

complaints against her for her obnoxious behavior towards employees in the hospital." *Id.*[12]
And still further, "[n]ow that Dr. Chacko has been removed from VAPHS, she wants to take
revenge against me through Dr. Shah who is now bent upon making my life miserable." *Id.*; *see
also* Pl.'s Ex. H at 4-5, ECF No. 28-9 ("Dr. Shah has cut my work schedule . . . [t]his
demonstrates that Dr. Shah is operating in a very malicious manner, probably under the guidance
of Dr. Chacko . . . [p]erhaps he is doing this to force me to quit my job and in the process
accomplish his and Dr. Chacko's objective of removing me from VAPHS").

However, apart from a bare assertion that "although Dr. Shah was not the decision-maker
with respect to the termination of Plaintiff's employment, he had significant input" in the
decision, nowhere is it indicated in the record that this workplace animosity between Dr. Shah
and Dr. Patel played any part in Director Wolf's signing of Dr. Patel's termination papers or Dr.
Sonel's adoption of Dr. Akwayena's post-GlidePath personnel reduction report and
recommendation[13] – let alone that any discriminatory animus on the part of Dr. Shah (who
himself was older than Dr. Patel), played any part in the actions of Director Wolf and Dr. Sonel.
*See* Def.'s Stat. Facts ¶ 95 (listing the birth year of Dr. Shah as 1945); Patel Dep. 9:19-20 (Dr.
Patel testifying that he was born in 1949); *Staub*, 131 S. Ct. at 1194; *Abramson*, 260 F.3d at 285-
86.

The record before the Court, even giving Dr. Patel the benefit of the doubt, reveals that
the "hostility" between Dr. Patel and Dr. Shah was at best nothing more than interpersonal
workplace strife, which in and of itself is insufficient to provide the causal link in a *prima facie*

---

[12] Dr. Chacko is older than Dr. Patel by five years. *See* Def.'s Ex. 41, ECF No. 24-14; Patel Dep. 9:19-20.

[13] Dr. Akwayena expressed his own frustration with the interpersonal strife between Dr. Shah and Dr. Patel, writing
to Dr. Sonel on June 24, 2010, that "I already met with them and urged them to deal with each other in a
professional manner and to pull back from the personal issues. . . . Unfortunately it looks like there is a
determination to create and maintain bad blood based on a mutual suspicion." Pl.'s Ex. K, ECF No. 28-12.

ADEA retaliation case. *See Hodson v. Alpine Manor Inc.*, 512 F. Supp. 2d 373, 386 (W.D. Pa. 2007) ("Personality conflicts and questioning of job performance are unavoidable aspects of employment; plaintiff must show legally sufficient evidence to be entitled to an actionable claim of discrimination."); *Vasbinder v. Sec. Dept. of Veterans Affairs*, 487 Fed. Appx. 746, 750 (3d Cir. 2012) ("the evidence indicates that [] 'bad blood' is a far more likely reason for the adverse employment action than age-based discrimination"); *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) ("Personality conflicts alone cannot supply a basis for an ADEA claim.")

Dr. Patel's remaining attempts to defeat summary judgment on causation also miss the mark. Plaintiff avers that his "high satisfactory" and "satisfactory" performance evaluations as a nuclear physician make Dr. Shah's opposition to Dr. Patel's promotion questionable. Pl.'s Br. in Opp'n to Mot. for Summ. J. at 8. However, Dr. Patel's performance evaluations as a nuclear medicine physician are immaterial to the undisputed fact that Dr. Patel was unqualified for the PET/nuclear physician position that Dr. Kanderi had assumed.

Plaintiff then attacks Dr. Shah's statistics highlighting the decline in volume of nuclear medicine cases, providing his own sworn declaration that the 2011-12 statistics reflect underreported numbers. *See* Pl.'s Br. in Opp. at 12; Pl.'s Ex. Q. Contrary to Defendant's assertion that a self-serving declaration is insufficient to defeat summary judgment, "the Supreme Court has made it clear that self-serving testimony may be utilized by a party at summary judgment." *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 501 (3d Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), for the proposition "that plaintiff may create material issue of fact by proffering, inter alia, 'her own affidavits'").

However, Dr. Patel's statistics argument fails because he simply attacks the wrong numbers. As Defendant argues, "[t]here is no dispute that the field of Nuclear Medicine was evolving and moving in the direction of PET/CT services," which triggered the VA to publish in 2007 "a directive authorizing the increased use of PET scanning as a resource for its veterans." Def.'s Br. in Supp. at 12. Nowhere in Plaintiff's sworn declaration does Plaintiff contest the substantially increased use of PET scanning, which Defendant avers triggered the need for VAPHS to have the full-time Dr. Kanderi absorb Dr. Klein's nuclear medicine work while meeting the increased need for PET practice.

Even if Plaintiff's declaration had instead contested the alleged increase in PET/CT services at VAPHS, Third Circuit jurisprudence makes plain that "a plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Keller v. Oriz Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (internal citation omitted). Indeed, the ADEA "was not intended as a vehicle for judicial review of business decisions." *Kephart v. Institute of Gas Technology*, 630 F.2d 1217, 1223 (7th Cir. 1980). Instead, "the nonmoving plaintiff must demonstrate such weaknesses [and] implausibilities . . . or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *Keller*, 130 F.3d at 1108-09. Thus, Dr. Patel cannot avoid summary judgment by simply arguing that VAPHS's statistical premise was wrong, Dr. Patel must instead set forth evidence of retaliatory animus or implausibility behind VAPHS's decision to terminate his employment. Dr. Patel's assertions of inaccurate nuclear medicine statistics, his positive nuclear medicine performance evaluations, and the workplace animosity between him and Dr. Shah are insufficient to establish

evidence of retaliatory animus or implausibility behind the termination decision by Director Wolf and Dr. Sonel, which Defendant avers was based on the VA's GlidePath fiscal plan, which looked in particular at reducing the number of part-time physicians, and Dr. Patel's skill set, which excluded the interpretation of PET/CT exams.

Plaintiff has simply failed to adduce sufficient evidence from which a reasonable jury could find that he has established the first and third requirements for a *prima facie* case of ADEA retaliation - that he engaged in protected conduct and that a causal link exists between Dr. Patel's alleged protected activity and VAPHS's adverse employment action.

## III.  CONCLUSION

For the foregoing reasons, Defendant Secretary Shinseki's Motion for Summary Judgment is granted in its entirety.  An appropriate Order will follow.

Mark R. Hornak
United States District Judge

Dated: November 27, 2013

cc:  All counsel of record